Good morning. May it please the Court. My name is Donna Gray. I'm an Assistant Federal Public Defender, and I represent the petitioner, Connie Letty LATU. I would first like to indicate that one of the issues raised by Mr. LATU in his brief was the issue of the Commerce Clause. And that case has been decided. One of the related cases, which is noted in our This Court has already ruled in CONSOG on the Commerce Clause issue following its prior precedent in HANA. Therefore, I will not address that issue. I will begin with what I believe is the primary issue, and that is whether or not Mr. LATU at the time he possessed the weapon was lawfully in the United States, that is, in the United Our position is that he was. Illegally or unlawfully in the United States is not defined in the statute. The common-sense meaning of it given by a dictionary is whether you are without authorization. In this case, the facts indicate, as does, I think, Ninth Circuit precedent, that given the fact that Mr. LATU's wife had filed an I-130 that was accepted by the Immigration Service and approved, her husband then filed a I-40. There's no Ninth Circuit case that actually decides that, correct? Well, certainly, Your Honor, I think there are at least two Ninth Circuit cases that come very close to saying that. Garcia? Well, close doesn't get you a brass ring. Well, that's true. They really don't. They're really the rank is dicta in both cases, actually. And they certainly don't decide the issue, correct? I mean, they don't even purport to decide the issue. They don't purport to decide that precise issue, Your Honor. But I wouldn't call it the rankest of dicta, mostly because it is intertwined, especially in Bravo-Mars Cris, with the Court's decision on whether or not the district court's jury instruction properly informed the court. In that jury instruction, in reliance on Garcia, the alien, an illegal alien with a filed 485 petition is lawfully within the United States. Let me just review the bedding on the facts. Mr. Lato comes in on a nonimmigrant visa. Correct, Your Honor. That visa expires. That visa expires. And he then has filed an adjustment of status. Correct. And at the time he is determined to be in possession of the weapon, the visa has expired. The application for adjustment of status has been filed but not yet ruled upon. Correct, Your Honor. And is there anything that we know about that application for adjustment of status that will tell us whether the granting of it is merely a ministerial act requiring the passage of time, whether it's highly speculative? What do we know, if anything, about that application for adjustment of status? I think it's important what we do know about that application for the adjustment, and that is, is that when the wife's I-30 petition is accepted and the alien files the I-485, the immigration service, or in this case, Homeland Security, issues an alien registration number to the alien. That number, along with the receipt  and pending petition, is then stamped into the passport of the alien. The alien is also given a permission or a card in which they are allowed to work in the United States. But I believe the fact, my position is the fact that the service goes so far as to put a authorization-type document right into the alien's passport. For that alien to use is, if not implicit, is not just implicit, but outright evidence of authorization that that person is here in the United States legally. So let's see. Somebody comes here on a visa, nonimmigrant visa, and you would say Congress can't keep that person from having a weapon because that would violate legal protection. Person comes on a nonimmigrant visa, so not a B, and then he overstays, in theory, illegally. And if he can manage to slap an application somehow, he's a nonimmigrant visa, he's never been made an immigrant yet, but your position is Congress has somehow left a hole because if he were here perfectly legally on a weapon, but if he just manages to file an application, Congress says, oh, that's okay, you can have a weapon. Or rather, you would say, they missed it. They did miss it, Your Honor. They failed to actually define what they mean by illegal and unlawful. And when Congress does that, you can use a common-sense understanding of that word. I think I can understand why they didn't define it. It's fiendishly complex because aliens are here under a wide range of circumstances. That's correct, Your Honor. And they're all different. In this case, If I were to use a common-sense reading of it, I would say Congress obviously meant the person is still illegal. We're just not going to be so harsh that we're going to grab him and throw him in prison or throw him out of the country while this application is pending. We're not going to do that. But we could. We could still file removal proceedings, and he could be removed, actually, with an application pending. Could he not? Yes, he could, Your Honor. And that's true of any alien in this country that holds a green card. They can be deported. He could be removed even while the application was pending. He could be removed. He was here illegally before. He can still be removed from being here illegally. But there's an application pending. Correct, Your Honor. And there's no removal proceedings. Common sense would tell me Congress didn't mean that at all. They thought he was still here illegally. But we're a nice nation, and so we're not going to throw him in prison right away, and we're not going to make him starve on the streets, and we're not going to throw him out of the country. We're going to give him some process. That would be common sense, too, would it not? Not necessarily, Your Honor, because Congress, after all, also passed these laws that allow aliens to adjust their status. And when they gave them that right to adjust status, they also gave them the ability to remain in the United States, to work, and to have certain rights. The reality is that I don't believe that the fact that he could be removed is of much import when any alien could be removed. The basis for removal against him, once the on-its-face plausible application for adjustment of status based on marriage to an American citizen has been filed, could the United States remove him without other indication of illegality? If he commits a crime and so on, yes. Of course. But assuming that he sort of keeps his nose clean, and the only thing that he's done that's, quote, bad is that he's overstayed his nonimmigrant visa. But because he's filed this application for adjustment of status based on marriage to an American citizen, he's received an alien, a number, and a stamp on his passport, and so on, what if DHS said, you know what, we want this guy out of here, and they seek removal proceedings against him? Do they have the right to get removal? I would think that they would have the right to do it under their removal due process procedures. They would have to come up with a reason under the removal statute that subjected him to removal. Well, what I'm asking is, is the mere fact of having overstayed the nonimmigrant visa enough of a ground for removal once he has filed a bona fide or sort of good-faith application for adjustment of status based on marriage to an American citizen? I don't believe so, Your Honor, because it wouldn't make any sense. It wouldn't make any sense, because why would you go to the trouble in the I-485 application process of granting this person the ability to work, providing them with information in their passport about the fact that they have an adjustment of status pending? It certainly wouldn't make any sense, and it would seem to defy due process. I know that's not the practice, but I'm asking, in a sense, a different question as whether Congress has given to the DHS even the legal ability to do it. I frankly don't know the answer to that, Your Honor. Okay. Counsel, we have to create a circuit split with the Fifth Circuit in the El Rawe case in order to rule in your favor. I don't believe so, Your Honor. Why not? I don't believe that, because I believe that the this circuit in Bravo and in Garcia has implied, if not outright stated, that once an individual has filed a valid I-485 petition, received permission from the United States to work, and has certain things put in its passport, that person is here with the authority of the Attorney General. If we assume that those rulings are dicta, would your answer change? No, Your Honor, it wouldn't. Why not? Because I don't think that even if it's dicta, it can be ignored. I think that the Court recognized that something different is happening to this alien than the normal situation where a person has simply overstayed their visa and they're completely in an illegal status. But what about the language from the Fifth Circuit that says, until the application is approved, the alien is here illegally? What do you do with that language? I think that language ignores an earlier part of the El Rawe decision, and that is its adherence to Orellano, which says you take a common-sense meaning of the word legal and unlawful, which means you have authorization to be in the -- to be where you are, therefore, you're legally where you are. And I think it's been ---- I know we're over time, but it sounds like your answer to Judge Rawlinson is, yes, we would create a split with the Fifth Circuit, unless we've already created it on our two prior cases. Perhaps, Your Honor. Right? Could I reserve a minute for rebuttal? Let's hear from the government, and then we'll give you some chance to respond. Thank you. We don't want to cut this short. Good morning. May it please the Court. Marshall Silverberg on behalf of the United States. The government totally agrees that there would be a split with the Fifth Circuit because of the El Rawe decision. And in response to Your Honor's question, the answer is yes. They could have started ---- we did, in fact, start removal proceedings against this individual, Mr. Lattu, despite the fact that he filed this application for adjustment of status. So the bottom line is yes. And your basis for removal was? That under ---- the basis for removal is that at the time he filed the application, he acknowledged that he had been charged with two felony cases involving assaults in State court. And at the time the removal proceedings started, he actually had been convicted of one of those assault cases. So the fact that he had been convicted of an assault led ---- actually, I'm sorry, excuse me, he had not yet been convicted of the assault, but he had been charged with assault in those two cases. But granted, the removal proceeding didn't actually start until after the federal case, and we got involved and we said, why is this person still here? Now, this, then, is going to be a hypothetical question. Assume that Mr. Lattu or someone in his position, except for what we're about to talk about, he's committed no crime. That's to say there's no ---- that ground for removability simply doesn't exist. He's come into this country on a nonimmigrant visa. The visa expires. At some point, he's married to an American citizen and an application for adjustment of status based on that marriage is filed. Is there a basis for the United States government to seek removal in that circumstance? Absolutely. Which is? Section 245 of the Immigration and Naturalization Act says that once you've overstayed your visa, you are removable. You're no longer lawfully authorized to be in the United States. And that's true even if sort of a good faith application for adjustment of status is filed. That is my understanding. That is correct. And the reason why it doesn't ---- I just heard a qualifier. That's your understanding. That means hesitation. Whenever anybody says, that's my understanding. Do you have cases that say that? Or, I mean, what are we talking about? What's right in the statute, I think, is that I don't think the statute says if you file an application, it somehow changes your status, but the statute says that once you overstay your visa, you're unlawfully in the United States. The statute doesn't say if you go ahead and file the application. There's no law that says that, that if you go ahead and file the application, your status has changed somehow. As you read it, then, what we have here is a practice that is to say, as an ordinary practice, the government does not seek removal for absent crime or, you know, that's a different case, which I ---- you're now telling me is this case. It's explained in the Eighth Circuit decision, United States v. Barzagon. And there they said it would make no sense for the government to seek removal proceedings against every person who files an application to change status. Because the vast majority of them are going to be granted. So why would you spend the money, the expense? I understand why the practice exists. Let me ask you a different question. Imagine that you are a lawyer and someone in Mr. Latu's position comes to you. He is in the Ninth Circuit. He has overstayed his visa and he has had a bona fide application for adjustment of status filed based upon marriage, and he says, may I legally possess a firearm? What's your advice? Absolutely not. And he says, legally educated, as he is not, but he says, but how can you say that when the language of Bravo clearly says exactly the contrary? Well, again, we believe that the language of Bravo was dicta. It derives from these two specific statutes that we go through in our brief, starting page 33, 34. But you said clearly not, but clearly not meaning clearly I'm going to disregard a very clear statement of the contrary in the Ninth Circuit. How can you possibly say clearly not? You could say, well, there's language in the Ninth Circuit that goes, that says you're absolutely entitled to it, but I don't believe it because it's while it's in a state, in fact, it's stated more than once, it's dicta. I think you've got to at least be to that degree of cautious when you say you can't have the gun. Well, if I'm a lawyer advising a client whether or not to possess a firearm, and the answer is if you say it's okay to possess a firearm and you may be subjected to criminal penalties, I would surely take the more conservative approach and say, no, don't possess a firearm until the law is clarified in the Ninth Circuit. Clearly in the Fifth Circuit, you couldn't possess that firearm. I understand that. But your first advice when you say you clearly can't, that can't be right. Well, I would say we wouldn't be having the argument we're now having. I would say don't do it. That's a different answer. Let me clarify it that way. Don't do it. Counsel, go ahead. In Bravo-Muskis, was the statute a little different in terms of being able to remove aliens? Yes. There were two different statutes enacted by Congress, and that's really what created the problem in this circuit. The two statutes were Title VIII United States Code, Section 1160, and that involved giving amnesty for agricultural workers, which clearly didn't apply to Mr. Olatu. In order to qualify, the alien had to apply in the 18-month period after 1986, which Mr. Olatu wasn't even here yet until 2003, I believe. He had to be residing in the United States. He had to be an agricultural worker. So that didn't apply to Mr. Olatu. And then the second statute codified the Title VIII United States Code, Section 1255, small a, parens e, also didn't apply to Mr. Olatu, but that applied only to people who had been in the United States for, let's see, since 1982, present in the United States continuously since November 1986, and had been otherwise admissible as an immigrant. So Mr. Olatu didn't qualify under any of those three categories. So the problem began with Garcia, which was in United States v. Hernandez in the Tenth for change of status under either of those statutes, they cannot be deported pending resolution of their application. That's what the law existed back in the 1980s under those two statutes. And that's when Garcia was decided. Then you had the court decision in Bravo, the district court decision, reading Garcia without understanding that Garcia was limited only to the state of the law at the time Garcia was issued. And the state of the law at that time was under those two statutes. But then you get to a situation in Bravo where the law has changed, and now an alien can be deported pending the application, resolution of the application. The mere filing of the application under this statute, immigration in that case did not do it. Roberts, what case are you relying on when you say the alien can be deported? Absolutely. And we had no no. What case are you relying on when you say that? Well, what we did was we the immigration and naturalization district director in Hawaii submitted a declaration that was admitted into evidence at trial and is part of the record here on the appeal. And we quote from it. And he says, there's nothing in the law that changes the status merely by filing the application. So if your honor is asking me, is there a provision of the law or the regulation that says the mere filing of the application changes your status, the answer is no. And in those other cases, the law did. In the other cases, the law did. And so those cases were extrapolated to the general proposition that you can't be deported. And Garcia was an SAW case, as to say, a Special Agricultural Worker case? That's my understanding, yes. I heard that qualifier again. Yes or no? It was that. Yeah. Specifically, it was a 1989 case. The law went into effect in 1986, so. But it was an SAW case? I can look, I guess, if you don't know for sure. It's a one-page decision, Garcia, and I don't think they specifically say whether it was an agricultural worker or not. Oh, but if it's not an SAW case, I mean, that really is different. Because SAW cases, you're absolutely right. There's a later adjustment of status that's automatic. But if you're not an SAW, then the later adjustment of status is not automatic. Well, not only that, but the question is, can you be deported pending resolution of the application? And you couldn't for the Special Agricultural Workers, and you couldn't for the other amnesty program. You could or could not. I'm sorry. Could not. Yeah. And you could not under the later program that was in 19 and 2000, I believe, also, the LIFE program. You could not be deported pending the application process. But Mr. Latu did not qualify under either of those programs. So his application No, I understand he's not qualified under either of those, but I'm trying to understand what Garcia's worth and whether it was because if it was decided under an SAW program and he'd already come in and had gotten his first determination of admissibility, well, that really is a different case. But I'm not sure. I'm going to have to look back to Garcia to see that. I'm not sure that that's so. I don't think they specifically mentioned it. It's a one-page decision that's very brief. It's the last sentence of the decision, I believe. They don't say under what program. Yeah, yes. It's a 1989 decision, and I think it's fair to infer that it was at least being governed by whatever the law was in 1989, not the law in 2000. Yes, but not everybody qualified under the SAW program. In fact, very few people did. So if, let me suggest this. If he was not an agricultural worker, then Garcia's clearly wrong, in my opinion. Because. Well, if you say Garcia's clearly wrong. If he's not an agricultural worker. Then that means we've got to go on lock. Garcia doesn't hold that. Okay. Garcia says nothing about that question. And the best Bravo does is to say by implication from Garcia. Right. That's your best repost. I understand, and I accept the advice of the Court. Take your foot back out of that. All right. Counsel, what was the statute you cited for the proposition that once one enters the country illegally, the illegal status remains until the application is approved? What was the statute? It's Title VIII of the United States Code, Section 1255. It's the Immigration and Naturalization Act. You have a section. That's pretty long. I don't. But if I do, I cite the two Ninth Circuit cases in the beginning. And I don't think even Ms. Gray is disputing that, that once you're in overstay, the burden is on the government to prove by clear and convincing evidence that you are in overstay. And once the government. She is disputing that. She's saying once you file an application, then you have the imprimatur of the United States and authority to stay here. So she is disputing that. That's what this case is all about. Right. But she's not saying that there's any statute that provides that. She's saying that based upon the case law and the general dictionary and common sense applications. But the case law that says, oh, and it's also the regulation, the ATF regulation that says a person is unlawfully in the United States who is a non-immigrant and whose authorized period of stay has expired. So that's in the regulation. What regulation are you citing? Okay. That's Title 27, Code of Federal Regulations, Section 478.11. It's on page 15 of my brief. Okay. And then it's this court in show, IE, SHO, AEE versus INS, 704, F2, 1079, and page 1082 stated, quote, For the INS to deport a non-immigrant overstay, it must prove by clear and convincing evidence that the Petitioner was admitted as a non-immigrant for a specific period, that the period has elapsed, and that the Petitioner is still in this country. And in that case, the defendant admitted that he had overstayed and therefore he was deportable. The court said SHO, IE is therefore deportable as an overstay. Okay. Counsel, we do have your brief. Yeah, yeah. I'm sorry. Okay. You've run over time. Thanks for your argument, and let's hear from the other side. Thank you very much, Your Honor. Thank you. I realize that we've pressed the Court for time this morning. Well, we have a very crowded calendar this morning, as you can see. So say what you need to say. I'll be very brief, Your Honor. I think this issue of removability is lacks the importance that the government seems to place on it for this reason. First, there's no question that once you're out of status and your non-immigrant visa has expired, you're deportable under the statute, or you're removable under the statute. We don't question that. But that's not Lotu's situation. He was for a period of time in out of adjustment, out of status. Once he filed his petition, his wife filed her petition, and he filed his petition. And he was given an alien number. He then became, in this country, with the authority of the attorney general. Are you saying he was no longer removable at that point? I'm not saying he was no longer removable. How could he be removable? I think that it's true that an alien in his status can be removed. They are generally are not removed. But wait a minute. How could he be removable? On what ground? Did he was here illegally? I think he could not be removed on that ground, Your Honor, because that would be the ground for removing him. I think it would have to be some other ground, like he committed a crime, he committed a crime, he lied on his petition. So you're saying he was not removable. In fact, any more than say an LPR would be removable. Well, an LPR might be even less removable. But you're just saying he was not removable at that moment, period. I think that as soon as he filed the application, he became non-removable, unless he did something wrong in the future. But of course, we're all non-prisonable unless we do something wrong in the future, too. Well, and that's a common sense thing, Your Honor. And why shouldn't that alien be accorded that common sense understanding of the way the law works? It all depends on one's view of common sense. That's all. But I do think that this aspect of removability is a red herring, because it depends on whether or not they are applying for status or their status has been completely adjusted and they have a green card. Well, it depends on whether or not the visa has been overstayed, doesn't it? Well, the visa was overstayed in this case. There's no question. But I mean, but if someone had not overstayed their visa, they would not be in the position of being here illegally, would they? Correct. A person that's an — that hasn't overstayed their visa is here legally. Right. And can't carry a weapon. And cannot carry a weapon. If it's a nonimmigrant visa. If it's a nonimmigrant visa. Which, unfortunately, I think is a problem, as we raised in our brief. But I — that's not in response to anything that the government argued, so I won't comment on that. Counsel, do you agree with opposing counsel's reliance on 8 U.S. Code Section 1255 and 27 CFR 471.11? I don't for this reason. I think that only applies to aliens that have overstayed their visa, and not necessarily to aliens that have filed a valid I-485 adjustment of status. It clearly applies to aliens that have overstayed their visa. Okay. Thanks. Thank you. Thank you very much. Good arguments. Tricky case. It is the case of the United States v. LATA is now submitted for decision. We have one more case on the argument calendar that is about to go away, at least  Are the lawyers here for Singh v. Ridge? Good morning, Your Honor. Edward Olson from the U.S. Attorney's Office on behalf of Alberto Gonzalez. Good morning, Your Honor. Marcin A. Robles on behalf of the defense. And I gather you have something to say to us? Yes, Your Honor.         Citation. Citation. Citation. Citation. Citation. Citation. Citation. Citation. Citation. Citation. Citation. That kind of obliged us to move to dismiss the petition jointly with the government. I can't hear you. I'm sorry. I'm sorry. Now, we just came across some information very recently that puts us in the position that we're in now where we are moving jointly with the government to dismiss. Okay. So, as far as we're concerned, what we have is a joint stipulation to dismiss the appeal. That's exactly correct, Your Honor. Okay. You'll get an order from us forthwith. Thank you, Your Honor. And we've seen the pieces of paper. Okay. Thank you for coming by. It was a pleasure. Thank you. May all your arguments be so short. That concludes our morning calendar. We will reconvene tomorrow morning at 9 o'clock.
judges: Fernandez, W. Fletcher, Rawlinson